# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ROBERT E. SMITH,           )
                                )
        Plaintiff,         )
                                )
v.                                )
                                )     Case No. 10-cv-1585
CHICAGO TRANSIT AUTHORITY,  )
                                )
        Defendants.     )     Judge Sharon Johnson Coleman
                                )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Robert E. Smith, filed a Third Amended Complaint on February 23, 2011, alleging that defendant, Chicago Transit Authority ("CTA") discriminated against him based on race when they terminated his employment and defamed him in an article that appeared in the Chicago Tribune newspaper on February 8, 2007. CTA moves for summary judgment, arguing that Smith cannot establish a *prima facie* case of racial discrimination or disparate treatment under the undisputed facts and his defamation claim is untimely. For the reasons stated below, the Court grants CTA's motion for summary judgment.

**Background**

The following facts are undisputed except where noted.[1] Plaintiff, Robert E. Smith, is an African American man, who was employed by the CTA from 1986 until his termination on January 24, 2007. Since April 25, 2004, Smith held the position of Transportation Manager assigned to the North Park Garage. On October 29, 2005, Smith was laterally transferred to the Bus Service Management area until CTA terminated his employment. Smith was an at-will employee.

---

[1] Both parties have filed motions to strike the other party's statement of facts. Both parties fail to strictly comply with LR 56.1 by including more than one fact per allotted paragraph. The Court declines to strike either party's statement of facts but has not considered those statements of fact that are unsupported by the record or constitute argument, conclusion, immaterial and vague assertions.

In 2004, the Chairman of CTA's Board of Directors, Carole L. Brown, issued Equal Opportunity ("EEO") policy statements that remained in effect for the duration of Smith's employment with CTA. The policy affirmed CTA's commitment to prohibiting workplace harassment, including sexual harassment defined as "[u]nwelcomed sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" where submission to such conduct is made a term or condition of an individual's employment, either explicitly or implicitly" or "[s]uch conduct has the purpose or effect of unreasonably interfering with the employee's work performance or creating an intimidating, hostile or offensive work environment". CTA communicated its EEO policies and the procedures to contact the CTA's EEO unit to its employees through training, workplace postings, and an administrative procedure. Smith was aware the CTA had an EEO Unit and recalls attending sexual harassment awareness training at CTA in December 2006. Smith was aware that sexual harassment was prohibited and, as a manager, he was expected to set an example by following the CTA's policy.

Pamela Beavers, an African American woman, managed the EEO Unit from approximately 1994 to June 30, 2009. In 2006-2007, the EEO Unit had three employees that investigated claims of violations of the CTA's EEO policy and reported to Beavers: Thelma Crigler (African American, now deceased); Salvador Ramirez (Hispanic) Senior Diversity Officer; and Alenda Young (African American) EEO Diversity Officer. CTA policy was for managers to report any incident that might be perceived as harassment to the EEO Unit. Ramirez taught managers that if an individual made a claim of harassment, they were to have the parties involved each complete a written report to forward to the EEO Unit, let upper management know of the claim, and then department management was to contact the EEO Unit. The parties agree that the EEO Unit was understaffed in 2006-2007. The EEO Unit received charges of violations of CTA policy directly from employees

making the charge and from managers. Sometimes department managers would request the EEO Unit investigate.

Once the EEO Unit received a charge of a violation of CTA policy, the assigned investigator would determine whether it was EEO-related, have a written report from the work unit or unse an Inquiry Complaint (form) and have the work location management collect written reports from the person complaining of harassment, the accused, and any witnesses. The EEO investigator would then conduct interviews of anyone with information regarding the incident. The investigator would make an initial recommendation as to whether any of CTA's EEO policies had been violated and provide that recommendation to Beavers. Beavers would then make a final determination by reviewing the investigation file, including the documentation, interview notes, emails, and reports to managers. Beavers did not, as General Manager of the EEO Unit, conduct interviews or, otherwise investigate claims herself. Before making a final determination as to whether an individual violated an EEO policy, Beavers would discuss the file with the investigator assigned to the claim.

In the fall of 2006, Smith was a Transportation Manager in Bus Service Management, a work unit responsible for the movement of buses and monitoring bus service in the field. Robert McCullough started as Bus Supervisor in the fall of 2006. In 2006, Marcella Harvey-McCall ("McCall"), an African-American woman, was a bus operator. On October 28 and 29, 2006, McCall was assigned to assist McCullough. Smith was McCall's manager in October 2006.

Smith had worked with McCall previously, when he was Transportation Manager assigned to North Park Garage. McCall claimed in the EEO investigation that, while at work on October 28, 2006, Smith asked McCall to perform a striptease for his wife and to join Smith and his wife in a sexual relationship. McCall refused and refused again when Smith allegedly made the same proposition the following day. Smith testified that McCall had previously told him she was a stripper. McCall testified that she did not know where Smith got the idea that she was a stripper.

McCall also testified that prior to 2006 McCall did not feel sexually harassed by Smith, but that he had made comments that made her uncomfortable. She did not report any of the comments made prior to 2006. McCall also alleged that on November 4, 2006, Smith threatened to report her for leaving early without permission. On November 6, 2006, McCall told Henry Bradford, Transportation Manager, about Smith's alleged conduct towards her.

Smith admits that he sat in the CTA vehicle assigned to him with McCall for two or three minutes while at the Howard Rail Terminal on October 28, 2006, but says it was because it was cold outside and he did not speak to her. Smith also admits to speaking with McCall about her schedule on October 29, 2006, McCall telling him she was leaving earlier than her assigned time and he told her she was not supposed to leave until several hours later. Smith also admits that he returned to the Howard Terminal after McCall had left on October 29, 2006, and McCullough told him McCall had left early and that McCall had accused Smith of sexual harassment. Smith next saw McCall on November 4 or 5, 2006, at the Forest Glen Garage and asked her why she had left early on October 29, 2006, and told her he should write her up for it. Smith testified that he was "just threatening her with that." Smith also testified that he asked McCall why she would lie about his approaching her with a sexual advancement.

Beavers first learned of the incident between McCall and Smith when she received a fax from Mary Beth Cobleigh-Beal, General Manager of the Forest Park garage, on November 6, 2006, attaching a four-page report from McCall. EEO investigator Alenda Young began the EEO Unit's investigation into McCall's claims by interviewing seven employees, including McCall, Transportation Manager Henry Bradford, Bus Service Management Pool Supervisor McCullough, Chief Clerk Cesar Lovera, and Transportation Manager II James Lachowicz on November 8, 2006, and she later spoke to Bus Clerk Valeda Springfield by telephone. Young interviewed Smith after conducting the other interviews due to scheduling conflicts. When Young met with Smith, she

realized that he had made comments to her that she considered inappropriate at a Bus Service Meeting a few months before. Young proceeded with the interview despite this realization. At her deposition, Young could not recall whether CTA had a written policy that an investigator cannot conduct an investigation of someone that the investigator alleges behaved inappropriately. Young removed herself from the investigation and Ramirez took over as lead investigator.

According to Beavers, Ramirez could rely on Young's notes of her investigation and Young could document her interviews. Beavers did not believe Young's continued involvement created a conflict of interest. Ramirez provided Beavers with his initial recommendation. Beavers believes that Ramirez reached his own conclusion about McCall's claims. Beavers reviewed the investigation file and supporting documentation provided by Ramirez. Beavers requested follow-up with Valeda Springfield, a union employee who alleged that Smith had engaged in inappropriate conduct. Although Smith denies the allegations, Springfield told the EEO Unit that Smith had made an inappropriate comment of a sexual nature two years prior to the incident with McCall. Springfield did not report the incident or file a claim with the CTA's EEO unit but she told her union representative and Chief Clerk Cesar Lovera. Smith recalls apologizing to Springfield. He asserts that the apology was for a comment on her shoes and her boyfriend and was not for any inappropriate conduct.

Ramirez submitted an investigation summary that included the information provided by Springfield, and a recommendation that Smith had violated a CTA EEO policy on sexual harassment. Beavers made the final determination that Smith violated CTA's workplace sexual harassment policy. Once Beavers determined that Smith violated CTA's EEO policy regarding workplace sexual harassment, on January 4, 2007, she sent letters to Smith, McCall, and Smith's managers, Walter Thomas, and William Mooney. Any discipline for an employee found to have

violated CTA's EEO policies was the responsibility of the employee's department management, not the EEO unit.

William R. Mooney, Sr. (Caucasian) was employed by CTA from June 2, 1975, until his retirement on January 1, 2010. He was Vice President, Bus Operations at CTA from November 3, 2002, through June 28, 2007, during which time he was the decision maker for discipline given to the Bus Operations managers who reported to him, including Smith. As a Vice President, Mooney did not discipline employees below the level of manager. Of the 164 managers who reported to Mooney in the fall of 2006, 101 were African American, 46 were Caucasian, 14 Hispanic, and three Asian individuals. There were 39 women and 125 men that reported to Mooney. While all CTA employees were required to follow CTA's EEO policies, the discipline Mooney gave managers who violated those policies was harsher than what a union employee might receive because Mooney expected managers to set an example for others of compliance with policies and good behavior. Disciplining union employees is different from disciplining at-will managers, like Smith, because the union has a collective bargaining agreement.

After receiving the letter from the EEO unit, Mooney had Walter Thomas oversee a separate investigation from the EEO unit's investigation by collecting documentation, meeting with Smith, and reviewing Smith's version of events. Thomas provided Mooney written results of those meetings. Mooney was seeking as complete an investigation as possible before determining the discipline for Smith. Mooney was aware that Smith denied all the allegations against him. Mooney did not analyze McCall's work record because a claim of sexual harassment from an employee was evaluated on its own merits. Mooney discharged Smith at a meeting attended by Smith and Thomas on January 24, 2007. Smith's replacement was an African American man.

David Schaefer was the one non-African American manager that Smith identified as having been accused of or engaged in sexual harassment but was not terminated. Mooney was not VP of

Bus Operations at the time Schaefer was disciplined and therefore was not involved in the decision. Mooney considered discipline for three other Transportation Managers, all of whom were African American. One, Robert Cossum, was suspended, and two were discharged. While Mooney was Chief Operating Officer over CTA's rail and bus systems, Mooney was aware that an EEO unit investigation had determined that there was insufficient evidence that a Rail Transportation Manager Kenneth Hughes (African American) had engaged in inappropriate behavior and therefore was not disciplined. While Mooney was Chief Operating Officer he was aware that Jack Hruby (Caucasian), Vice President of Transit Operations, who reported to Mooney, discharged Bus Maintenance Manager Akin Olumuyima (African American) after the EEO unit determined that Olumuyima had violated CTA's EEO policy regarding workplace sexual harassment towards Lisa Govan (African American), a Bus Server, by making sexual comments.

Smith filed a charge with the Equal Employment Opportunity Commission on October 24, 2007, alleging sex and race discrimination based on his discharge from employment. Following receipt of his right to sue letter, Smith filed the complaint in this case.

**Legal Standard**

Summary judgment is appropriate if the evidence shows that there is "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment has the "initial responsibility" to show that there is no genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) but the Court must view all facts and make all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To avoid summary judgment, the non-moving party must provide enough factual evidence to show there is a genuine issue of material fact that warrants a trial. *Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008). Defeating summary judgment requires more than "some metaphysical doubt as to the material

facts," and "neither speculation nor generic challenges to a witness's credibility are sufficient to satisfy this burden." *Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010).

**Discussion**

CTA moves for summary judgment on all three counts of Smith's Third Amended Complaint. Counts I and II allege racial discrimination under Title VII, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. Count III alleges defamation per se by the CTA when it provided information regarding the circumstances of Smith's termination that appeared in the February 8, 2007, Chicago Tribune. By failing to oppose summary judgment on Count III, Smith concedes that his defamation claim is barred by the Illinois statute of limitations, 735 ILCS 5/13-201. Accordingly, this Court grants summary judgment in favor of CTA on Count III and considers only Smith's discrimination claims.

Courts employ the same substantive analysis for discrimination claims brought under either Title VII or section 1981. *Johnson v. General Bd. of Pension & Health Benefits of the United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013). Smith claims that CTA applied its sexual harassment investigation policy in a discriminatory manner by having the Equal Employment Opportunity Unit, rather than their operations unit, conduct investigations of African American employees accused of harassment. Smith must prove his claim either with direct evidence or indirect evidence of discrimination. *Id.* "[T]he plaintiff one way or the other must present evidence showing that ... a rational jury could conclude that the employer took that adverse action on account of [his] protected class, not for any non-invidious reason." *Hester v. Ind. State Dep't of Health*, 726 F.3d 942, 946 (7th Cir. 2013) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood , J., concurring)).

*I. Direct Method*

CTA argues that there is no direct evidence of intentional discrimination. In order to show direct discrimination Smith can present direct or circumstantial evidence that would allow a jury to

conclude the discrimination motivated an adverse employment action. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). The Seventh Circuit has stated that direct evidence consists of either an "outright admission by the decision maker that the challenged action was undertaken because of the [plaintiff's race]" or a "convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004).

The Seventh Circuit has identified different types of circumstantial evidence that can point to intentional discrimination. *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008). One type of circumstantial evidence "consists of suspicious timing, ambiguous statements [that are] oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. . . ." *Id.* Another type is evidence that shows similarly situated employees, outside the protected class, have received systematically better treatment. *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 862 (7th Cir. 2007). Smith may also use "bits of circumstantial evidence… to compose a convincing mosaic of discrimination" to prove discrimination under the direct method. *Id.*

Here, there is no direct evidence of discrimination. Smith asserts that CTA had a policy that gave exclusive jurisdiction over investigating discrimination and harassment complaints to the CTA's EEO Unit and requiring the EEO Unit to reach a conclusion on the complaint. Smith contends that CTA regularly violated this policy by allowing the operations departments of non-African American employees accused of discrimination or harassment to conduct the investigation and reach a conclusion, thereby allowing CTA's non-African American employees to avoid investigation by the EEO Unit. There is no evidence in the record to support this assertion. Instead, the record indicates

9

that operation departments were permitted to conduct their own investigation into allegations of sexual harassment. Moreover, it is undisputed in the record that, even where the EEO unit made a determination that an employee violated the sexual harassment policy the imposition of discipline is up to the department supervisor. Only half the individuals that Smith points to as support for his contention that the CTA violated its own policy along racial lines were non-African American. (*See* Stipulation, Ex. D). Further, the parties stipulate that CTA has no information whether an EEO unit investigation occurred for claims against two of those individuals. (*See* Stipulation, Ex. E). Therefore, the evidence Smith relies on does not show that African American employees were subject to investigation by the EEO unit when accused of sexual harassment in any greater number than non-African Americans. This Court finds that there is no direct evidence that CTA applied its sexual harassment policy disparately against African Americans.

## *II. Indirect Method*

CTA argues that Smith cannot establish a *prima facie* case of discrimination because he was not meeting the minimum expectations of the job by violating the sexual harassment policy, he cannot point to any similarly situated non-African Americans managers who were treated more favorably, and he cannot show that CTA's reason for terminating him was pretextual. To succeed under the indirect method, Smith must establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973). Smith must prove that (1) he is a member of a protected class; (2) he performed his job to meet expectations; (3) he suffered an adverse employment action; and (4) he was treated differently than individuals who were similarly situated but outside his protected class. *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009). However, summary judgment is appropriate in favor of CTA if Smith cannot demonstrate any one element of the *prima facie* case. *Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007).

If Smith establishes a *prima facie* case of discrimination, the burden shifts to CTA to articulate a legitimate, nondiscriminatory reason for his termination. *McDonnell Douglas Corp.*, 411 U.S. at 802. If CTA satisfies this burden of production, Smith must then establish that there is an issue of material fact as to whether CTA's "proffered reasons are merely pretext for unlawful discrimination or retaliation, in order to survive summary judgment." *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004).

Smith is African American and was terminated from his employment with CTA therefore the first and third elements of *prima facie* discrimination are not at issue. It is undisputed that Smith was found by the EEO unit to have violated the CTA's sexual harassment policy.[2] CTA argues that Smith was not meeting CTA's employment expectations because he was in violation of the sexual harassment policy. Here, Smith attempts to show that McCall had reason to fabricate the allegation of sexual harassment levied against him. Yet, even if this Court accepts as true the assertion that McCall had left early without permission, that fact alone does not refute the sexual harassment claim. Smith admits that "Mooney did not analyze McCall's work record because a claim of sexual harassment from an employee was evaluated on its own merits." (Dkt. 142, Pl. Resp. DSF ¶66). Therefore, at the time of his discharge from employment Smith was not meeting CTA's employment expectations. *See Forrester v. Rauland-Borg Corp.,* 556 F.Supp.2d 850 (N.D.Ill. Nov. 16, 2005) (The district court granted summary judgment in favor of the employer in part because there was no evidence to refute the sexual harassment claim and therefore the plaintiff was not meeting employment expectations and the company had a non-discriminatory reason for discharging him).

With respect to the fourth prong, Smith also fails to show there is a genuine issue of material fact that he was treated differently than similarly situated employees outside his protected class. As noted above, the Discovery Stipulation on which Smith relies for a set of comparators contains eight

---

[2] Although plaintiff disputes that he did in fact sexually harass McCall and challenges the adequacy of the investigation, there is no dispute that the EEO unit concluded that he violated the CTA's sexual harassment policy.

CTA employees whose sexual harassment allegations were investigated by department management rather than the EEO unit. Only half of these employees were not African American therefore this is not evidence that non-African American employees were treated more favorably. Furthermore, the non-African American employees listed in the Discovery Stipulation were not managers and were not disciplined by Mooney. While proposed comparators need not be identical in every conceivable way, they must be directly comparable in all material respects. *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013). Thus, these individuals are not adequate comparators.

The other comparator offered by Smith is David Schaefer a non-African American manager that Smith identified as having been accused of sexual harassment but was not terminated.[3] However, Mooney was not VP of Bus Operations at the time Schaefer was disciplined and therefore was not involved in the decision whether to discipline him. "The point of determining whether different decision makers were responsible is to determine whether two employees were held to different standards by virtue of the different perspectives and expectations of different and independent decision makers." *Id.* at 707. This Court finds that Smith fails to present any adequate comparators to show similarly situated employees outside his protected class that were treated differently. Therefore, Smith has not established a *prima facie* case of discrimination.

Even if Smith presented evidence to create a genuine issue of material fact as to discrimination, CTA has presented a legitimate non-discriminatory reason for Smith's termination and Smith cannot show evidence that the reason was pretextual. CTA maintains that it terminated Smith's at-will employment after investigating McCall's claim of sexual harassment and concluding that Smith had violated CTA's policy prohibiting such behavior. Smith argues that CTA's proffered reason is mere pretext by attacking the adequacy of the investigation. This Court finds Smith's attempt to undermine the integrity of the investigation into McCall's claims unavailing. "[A]rguing

---

[3] This Court could find no evidence in the record to support plaintiff's assertion that David Schaefer had been accused of "many instances" of sexual harassment yet remained in his job.

about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest." *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 678 (7th Cir. 1997).

Smith's assertion that Ramirez, the lead investigator for the EEO unit assigned to McCall's claim, was covering for Hispanic employees by finding Smith had violated CTA's sexual harassment policy is equally unpersuasive. Essentially, Smith argues that McCall, who was African American, accused Smith of sexual harassment in order to avoid discipline for herself and Chief Clerk Lovera (Hispanic), who allegedly looked the other way or perhaps altered McCall's time sheets and Ramirez (Hispanic) furthered this plan by recommending to Beavers, his EEO unit supervisor who is African American, that Smith violated CTA policy. Yet, it is undisputed that the decision to discharge Smith came from Mooney not from Ramirez. There is no qualified evidence to support this theory and speculation is insufficient to avoid summary judgment. *Hanners v. Trent et al.*, 674 F.3d 683, 692 (7th Cir. 2012).

In sum, the undisputed evidence establishes that CTA terminated Smith's employment based on allegations that he violated the CTA's sexual harassment policy. There is no evidence in the record creating a genuine issue of material fact that CTA's termination of Smith's employment was actually motivated by racial animus. Smith was investigated by the EEO unit and then independently investigated by his superior Mooney within his operations department. After concluding that Smith had violated CTA's prohibition on sexual harassment, Mooney terminated his employment. There is no indication from the record that the procedure applied to Smith was any different than for any other managerial, at-will employee. No federal rule requires just cause for discharge and this Court will not stand in the position of a super-personnel department that reexamines an entity's business decisions. *Kariotis,* 131 F.3d at 678.

**Conclusion**

Based on the discussion contained herein, defendant CTA's Motion for Summary Judgment [135] is granted. The parties' motions to strike are denied [141, 148]. The jury trial scheduled for 7/21/2014 is stricken.

IT IS SO ORDERED.

Date: July 2, 2014

Entered: _____

United States District Judge